IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| David Andres Ortiz Molina, #315546, | ) | Civil Case No. 2:15-cv-1263-RBH-MGB |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Cecelia Reynolds, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

The Petitioner, a state prisoner represented by counsel, seeks habeas relief pursuant to 28 U.S.C. § 2254.  This matter is before the Court on Respondent's Motion for Summary Judgment. (Dkt. No. 15; *see also* Dkt. No. 14.)  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this Magistrate Judge is authorized to review the instant petition for relief and submit findings and recommendations to the District Court.

The Petitioner filed this habeas action on March 18, 2014. (Dkt. No. 1.) On August 11, 2015, Respondent filed a Motion for Summary Judgment. (Dkt. No. 15; *see also* Dkt. No. 14.) On October 28, 2015, Petitioner filed his Response and Memorandum of Law in Opposition to Motion for Summary Judgment. (Dkt. No. 20.)

## **PROCEDURAL HISTORY**[1]

Petitioner, David Andres Ortiz Molina, #315546 (Petitioner), is presently confined in the Lee Correctional Institution, of the South Carolina Department of Corrections (SCDC), as the result of his Greenville County, South Carolina, conviction and sentence. The Greenville County Grand Jury indicted Petitioner in April 2006 for assault and battery with intent to kill (ABIK)

---

[1] Petitioner has agreed that the Procedural History in the Respondent's Return and Memorandum of Law in Support of Motion for Summary Judgment (Dkt. No. 14) is "substantially correct" and has not made any objections to it. (Dkt. No. 20 at 1.)  Therefore, it is reproduced here verbatim.

(2005-GS-23-06796). (Dkt. No. 14-4 at 53; 55.) He was charged with attacking his former girlfriend, with a knife, on February 9, 2005. Jeffery Falkner Wilkes, Esquire, represented him on this charge.

On May 15-18, 2006, Petitioner received a jury trial before the Honorable D. Garrison Hill. The jury convicted him, as charged, and Judge Hill sentenced him to twenty years imprisonment. (Dkt. Nos. 14-1; 14-2; 14-3; 14-4; 14-4 at 54 & 57-59.)

Petitioner timely served and filed a notice of appeal. Assistant Appellate Defender Eleanor Duffy Cleary represented him on appeal. On April 3, 2008, Petitioner (with the assistance of counsel) filed a Final Brief of Appellant (Dkt. No. 14-4 at 72-73), in which he presented the following issue:

> Whether appellant Molina was deprived of his Sixth Amendment right to a fair and impartial jury where the jury panel was exposed to extraneous information where the victim showed the panel her scar and said the perpetrator had been caught?

(*Id.* at 75.) The State had previously filed a Final Brief of Respondent on March 31, 2008. (*Id.* at 62-71.)

On February 10, 2009, the South Carolina Court of Appeals filed an Opinion affirming Petitioner's conviction and sentence. *State v. David Andres Ortiz Molina*, 2009-UP-073 (S.C. Ct.App., Feb. 10, 2009). (Dkt. No. 14-4 at 84-85.) It sent the Remittitur to the Greenville County Clerk of Court on February 26, 2009.

Petitioner filed a *pro se* Post-Conviction Relief (PCR) Application (2009-CP-23-10561) on December 15, 2009. (Dkt. No. 14-4 at 88-93.) He raised the following allegations in his Application:

    A. Ineffective Assistance of Trial Counsel:

(*Id.*)  The State filed its Return on April 21, 2010. (Dkt. No. 14-4 at 94-98.)

The Honorable Edward W. Miller held an evidentiary hearing into these claims on April 3, 2012 at the Greenville County Courthouse. Petitioner was present at the hearing and Tommy A. Thomas, Esquire, represented him. Assistant Deputy Attorney General Karen C. Ratigan represented the State. Petitioner testified on his own behalf at the hearing. He also presented testimony from Lee[2] Connelly and from trial counsel, Mr. Wilkes. (Dkt. No. 14-4 at 100-84.)

Judge Miller denied relief and dismissed the Application with prejudice in an Order of Dismissal filed on January 7, 2012. The Order of Dismissal addressed Petitioner's claims that: (1) trial counsel was ineffective for failing to hire expert witnesses to assist him with the State's canine testimony and DNA evidence; (2) trial counsel was ineffective for not better challenging the timeline in the case; (3) trial counsel was ineffective for not objecting to the State's closing argument based upon the Assistant Solicitor allegedly misstating the timeline; (4) trial counsel was ineffective for failing to investigate the victim's ex-boyfriends; and (5) trial counsel was ineffective for not investigating the jail informants who testified against Petitioner at trial. (Dkt. No. 14-4 at 186-94.)   Petitioner filed a Motion to Alter or Amend, which was dated June 15, 2012. (*Id.* at 195-97.) The State filed a Return to Motion to Alter or Amend the Order of Dismissal, which was dated June 22, 2012. (*Id.* at 198-201.) Petitioner thereafter withdrew his motion, through a letter written to Judge Miller by collateral counsel, and Judge Miller denied Petitioner's motion in a Final Order of Dismissal filed on September 11, 2012. (*Id.* at 210-11.)

Petitioner timely served and filed a notice of appeal. (Dkt. No. 14-4 at 212.) Mr. Thomas continued to represent him in collateral appellate proceedings. On June 27, 2013, Petitioner (with the assistance of Mr. Thomas) filed a Petition for Writ of Certiorari. He raised two Questions Presented on certiorari:

---

[2] The Respondent incorrectly stated the investigator's name as "Leigh."

1. Did the Post-Conviction Relief Judge err in not allowing the testimony of one of the original Jurors in the case that she was pressured by the other jurors to vote guilty?

2. Did the Post-Conviction Relief Judge err in not granting the Appellant relief on the basis that Trial Counsel was ineffective for not presenting evidence that it would not have been possible for the Appellant to have been at the location of the crime during the time in question?

(Dkt. No. 14-8 at 4.) The State filed a Return to Petition a Petition for Writ of Certiorari on August 21, 2013.

The South Carolina Court of Appeals filed an Order denying certiorari and granting counsel's petition to be relieved on December 12, 2014. It sent the Remittitur to the Greenville County Clerk of Court on January 05, 2015.[3]

## Grounds for Habeas Relief

Petitioner filed the instant habeas petition (Dkt. No. 1) on March 18, 2015, wherein he raised the following grounds for review (verbatim):

> **GROUND ONE**: The Petitioner's right to be tried by a fair and impartial jury was violated by the trial court's failure to grant a mistrial after the victim spoke to potential jurors prior to trial.
>
> **Supporting facts:** Before the jury was selected, it was revealed that one of the potential jurors had a conversation with the victim upon entering the courthouse. The victim informed the potential juror that she had been assaulted in her home and that the assailant had been apprehended. The potential juror disclosed this conversation to at least one other juror. Both jurors testified that their discussion occurred in the jury room prior to jury selection and that they had the conversation in a normal tone. Both jurors were excused by the trial court, but the trial court refused to quash the jury and begin anew with an untainted jury pool.
>
> **GROUND TWO**: The Petitioner's right to the effective assistance of counsel was violated by trial counsel's failure to present evidence that he could not have committed the crime in the time frame provided.
>
> **Supporting facts:** There was a twenty-five minute time frame in which the Petitioner could have left his work, traveled to the victim's home, and attacked her. At the Petitioner's PCR hearing, Lee Connelly, a private investigator, testified that it took her twenty to twenty-one minutes, with no traffic, to make it to the

---

[3] End of verbatim quote of procedural history.

victim's home from the Petitioner's workplace. There was also evidence, however, that there was construction on the interstate while the Petitioner was driving to the victim's home. Had defense counsel investigated this evidence, he could have shown that it was highly unlikely, if not impossible, for the Petitioner to have committed the crime.

## APPLICABLE LAW

### Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

### Habeas Standard of Review

Since the Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>     2. resulted in a decision that was based on an
>        unreasonable determination of the facts in light of the
>        evidence presented at the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## DISCUSSION

The undersigned recommends that Respondent's Motion for Summary Judgment (Dkt. No. 15) be granted. The facts presented at the Petitioner's trial are germane to both grounds for habeas relief. Around midnight on February 8, 2005, the victim, a 21 year old female, was attacked after she exited her car to enter her residence. (Dkt. No. 14-1 at 111.) The victim fought back by kicking and hitting her assailant. (*Id.* at 114-118.) During the attack, the assailant used a knife to cut the victim's face and leg. (*Id*. at 113; 120.) The assailant did not speak at all during the attack[4] and did not attempt to take any of the victim's belongings, undress her, or touch her in a sexual manner. (*Id.* at 116.) The assailant then ran away, and the victim was able to run into her residence. (*Id.*) The victim gave a detailed description of the assailant including his build, the clothing he was wearing, and a unique ski mask that was green and gray with burgundy

---

[4] Petitioner was described by the victim as having a distinct accent. (Dkt. No. 14-1 at 116.)

stitching around the eyes. (*Id.* at 110.) The victim described the assailant as having a distinct and swift manner of running on his tiptoes. (*Id.* at 115.)

Petitioner met the victim when he purchased a cell phone at the victim's place of work. (Dkt. No. 14-1 at 85-86.) The victim and Petitioner began dating shortly thereafter in late August or early September of 2004. (*Id.* at 86.) The victim and the Petitioner had a rocky relationship, and the victim finally broke up with the Petitioner in December of 2004. (*Id.* at 85-86.) After that time, they still saw each other socially occasionally, and they had intercourse. (*Id.* at 93-94.) Following the break-up, Petitioner began incessantly calling the victim after she asked him to stop. *(Id.* at 87-90.) The victim would sometimes have to turn her phone off because Petitioner would not stop calling her. (*Id.*) He told the victim they were "destined" to be together. (*Id.*) Petitioner began leaving notes for the victim to find, sending her flowers and making her Colombian desserts, such as flan and rice pudding.[5] (*Id.*)

Petitioner soon began telling the victim about visions and dreams he was having. Petitioner told the victim he dreamed that they were both dragons. (Dkt. No. 14-1 at 91-92.) Her dragon was attacked and Petitioner's dragon could do nothing to stop the attack. Petitioner believed this dream was a foreshadowing of the future and she needed his protection. (*Id.*) Later, Petitioner saw a hat that the victim always wore to her second job as a dog groomer. (*Id.* at 92-93.) Petitioner told the victim he had a vision she would be attacked at the dog grooming business. (*Id.*)

In January of 2005, Petitioner came to the dog groomer where the victim worked to try to reinitiate their relationship. (Dkt. No. 14-1 at 93.) Petitioner stated he saw something on the live-

---

[5] Petitioner is from Colombia. (Dkt. No. 14-1 at 89.)

feed of a security camera in the back of the business.[6] (*Id.*) The Petitioner went outside and staged an attack claiming he had physically fought off two men that were coming to rape the victim and her co-worker. (*Id.* at 97-99.) Petitioner claimed he had been shot but returned from the "hospital" very quickly. Petitioner told the victim that he had "bled" for her and she did not appreciate it enough. (*Id.* at 101.) Following the alleged "attack," Petitioner left a letter on the victim's car at her house. (Dkt. No. 14-4 at 28-29.) In the letter the Petitioner apologized for acting "obsesive [sic] and crazy." (*Id.*) Petitioner stated in the letter that he hoped the victim understood why her called her "100000 times" and that he was "not dangerous or a psychopath [sic]." (*Id.*) In the letter, the petitioner also referred to his vision being fulfilled when he fought off the alleged attackers at the dog grooming business. (*Id.*)

Shortly after the letter was received, the victim was attacked at her residence on the night of February 8, 2005. Petitioner was working third shift on that night. The office manager at the Petitioner's place of work testified at trial that the Petitioner clocked out at 11:30 P.M. for break, and clocked back in again at 11:40 P.M., but that the time clock was seven minutes slow, so that he actually clocked out at 11:37 P.M., and clocked back in at 11:47 P.M. (Dkt.No. 14-2 at 108-109.) A co-worker, testified that he saw the Petitioner leave after clocking out at 11:40 P.M. and that the Petitioner did not come back that night. (*Id.* at 116-119).

Immediately after the attack, the victim called 9-1-1 from her cell phone at 12:12 A.M. on February 9, 2015. (Dkt. No. 14-1 at 118-119; 123.) While on the phone with 9-1-1, Petitioner called her; she told him that she had been attacked, and he stated that he would come over. (*Id.*) The Petitioner arrived at the scene before the police did, and his voice could be heard on the

---

[6] The video camera did not record as it only provided a live-feed. (Dkt. No. 14-1 at 93.)

second 9-1-1 call the victim made. (*Id*. at 122.)  Petitioner insisted that he stay with the victim to protect her and tried to get a key to her home, but her family would not give him one. (*Id.* at 127.)

A few days after the attack, the victim was in her kitchen and began to draw a picture of the assailant for law enforcement at her mother's suggestion.  (Dkt. No. 130.)  Petitioner was sitting with the victim as she illustrated the ski mask. (*Id.* at 131.)  The victim did not color in a portion of the mask because she could not recall the color. (*Id.* at 131-135.)  Petitioner told the victim it was hunter green. (*Id.*)  Realizing he was caught, Petitioner first claimed the victim had told him the color, then changed his story by saying one of the alleged attackers of Petitioner at the dog grooming business wore the same mask.[7] (*Id.*)  The victim noted Petitioner was awkward and visibly squirming. (*Id.*) Petitioner soon started crying and left. (*Id.*)  The victim then told Petitioner the following day that they could not speak to each other and that she did not want to see him again. (*Id.* at 136.)  The final encounter the victim had with the Petitioner occurred that evening at her mother's home, after the phone conversation, when she found the Petitioner looking into the window of the kitchen. (*Id.* at 137.)

The State presented the testimony of two jailhouse informants as well.  Both informants had been held with Petitioner and testified to details of the attack told to them by Petitioner.  These details included that Petitioner had not meant to injure the victim, had intended to attack the victim's new boyfriend, and had jumped over the victim's car when he was charging at her. (Dkt. No. 14-2.)

---

[7] This was inconsistent with prior descriptions of the alleged attackers at the dog grooming business that Petitioner had told the victim.

Petitioner took the stand in his own defense. The Petitioner testified that there was a fight at the dog grooming business and that he did fight off two assailants that evening. (Dkt. No. 14-3 at 82-86.) He further testified that he left work the night of the incident to bring the victim some rice pudding, but that he became stuck in traffic due to construction on the interstate. (*Id.* at 99.) When he talked to the victim on the phone, she told him that she had been attacked and he rushed to her home. (*Id.* at 101.)

## A. Ground One: Petitioner's Right to a Fair and Impartial Jury

Ground One of the Petitioner's habeas petition is without merit, and the Respondent is entitled to judgment as a matter of law. During jury selection for Petitioner's trial, Juror #154 indicated that while he was in line to enter the courthouse, he was behind "a lady with a scar on the side of her face" who told him that she had been attacked in her home. (Dkt. No. 14-1 at 26-27.) He asked her if the assailant had been apprehended, and she responded "yes." (*Id.*) Immediately following this disclosure, defense counsel moved for a mistrial. (*Id.* at 29.) The trial court excused the jury venire and permitted defense counsel to question Juror #154. Juror #154 testified that there were several people present when the conversation with the victim occurred. (*Id.* at 34.) He further testified that he discussed this conversation later with Juror #176 while in the jury room. (*Id.* at 35.) He testified that while this conversation took place, there were "a few" other jurors in the jury room, but that "there were very few in the general vicinity of where we were." (*Id.*) The conversation occurred in a normal tone (*Id.* at 36.)

Juror #176 testified as well, and he confirmed the general details of Juror #154's account. (Dkt. No. 14-1 at 43-45.) Juror #176 estimated that there were approximately twenty potential jurors in the jury room when the conversation occurred. (*Id.*)

Following Juror #154's testimony, defense counsel moved again for a mistrial and argued the entire jury pool was tainted. (Dkt. No. 14-1 at 37.) The trial court excused Jurors #154 and #176 but denied the mistrial motion. The trial court asked the remaining jurors if they had "overheard any conversations or been involved in any conversations about this case while here at the courthouse today," and no one responded in the affirmative. (*Id.* at 50.)

On appeal, the Petitioner argued that his constitutional right to a fair and impartial jury was violated, particularly because the victim's statement to Juror #154 "tainted the entire jury pool and a new panel should have been convened in order to provide Molina with a fair and impartial jury." (Dkt. No. 14-4 at 80.) The South Carolina Court of Appeals affirmed and concluded that the trial court's refusal to grant a mistrial was not an abuse of discretion. (*Id.* at 84-85.)

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed…." U.S. Const. amend. VI. The Sixth Amendment right to an impartial jury was extended to apply to state courts by the due process clause of the Fourteenth Amendment. *Ristaino v. Ross*, 424 U.S. 589, 595 (1976). A criminal defendant is entitled by due process to "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The trial judge "is best situated to determine competency to serve impartially." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984); *see also United States v. Cabrera-Beltran*, 660 F.3d 742, 749 (4th Cir. 2011). "[W]hether a juror can in fact do that is a determination to which habeas courts owe special deference" and may only be set aside for manifest error. *Patton*, 467 U.S. at 1037.

In the case at bar, the state court's rejection of Petitioner's motion for a mistrial for a tainted venire was not "contrary to" and did not involve an "unreasonable application of" clearly established Supreme Court precedent under §2254. The trial judge appropriately questioned the venire and removed them from the court room to question Juror #154, who spoke with the victim, and Juror #176, who spoke with Juror #154. After being questioned by Petitioner's counsel, both of these jurors were excused from the venire for Petitioner's case. The trial judge questioned the remaining venire to determine if any other members of the venire had any outside knowledge of the case specifically referencing overhearing conversations in the courthouse. (Dkt. No. 14-1 at 50.) No one responded that they had any knowledge.[8]

Petitioner argues that the entire venire was tainted and therefore his Sixth Amendment rights could only be met by being tried with a new venire. (Dkt. No. 20 at 11.) Petitioner has not put forth any evidence to support his argument. This issue was ruled on by the trial judge and the Court of Appeals. This court does not find any manifest error to alter the sound reasoning of the state courts. As to Ground One, Petitioner has not met his burden under §2254(d), and this court recommends that the Respondent is entitled to judgment as a matter of law.

**B. Ground Two: Ineffective Assistance of Counsel by Failing to Investigate and Present Evidence that Time-Frame Precluded Petitioner from Committing Crime**

Ground Two of the Petitioner's habeas petition is without merit and the Respondent is entitled to judgment as a matter of law. Petitioner argues that his trial counsel failed to investigate and present an alibi defense based on the Petitioner not having time to drive to the victim's home from his workplace in time to attack the victim. (Dkt. No. 20 at 12-18.) The

---

[8] "[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *United States v. Olano*, 507 U.S. 725, 740 (1993) (quoting *Francis v. Franklin,* 471 U.S. 307, 324, n. 9 (1985)).

Petitioner clocked into work at 11:47 P.M., but then left the business, and did not return again that night.[9] (Dkt. No. 14-1 at 108-109.) The victim's phone records showed that her first call from her cell phone to 9-1-1 was at 12:12 A.M. (Dkt. No. 14-1 at 123.) Assuming that Petitioner did clock himself in at 11:47 despite evidence to the contrary, there was a twenty-five-minute gap between the time Petitioner left his workplace and the time the victim called 9-1-1 immediately after the attack. The victim testified at trial that it took her approximately twenty to twenty-five minutes to drive from Petitioner's work to her home. (*Id.* at 124.)

The United States Supreme Court has said that a meritorious ineffective assistance of counsel claim must show two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance. *Id*. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297-99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir. 1985). In order to establish the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional

---

[9] On the night of the incident, the Petitioner's time card was clocked out at 11:37 P.M., and clocked back in at 11:47 P.M. (Dkt.No. 14-2 at 108-109.) The card was not clocked back out following 11:47. There was evidence presented at trial that Petitioner left earlier than 11:47. A co-worker testified that he saw Petitioner leave "when he checked out" and that Petitioner left at "11:40." (Dkt. No. 14-2 at 116 & 118.) Despite Petitioner claiming to be at work during the attack, the witness told Petitioner "he wasn't gonna lie for him" when the detectives asked the witness if he was at work during the attack. (*Id.* at 120.) Additionally, the state presented the testimony of a jailhouse informant who testified Petitioner told him he had a friend that would clock him into work if he requested it. (Dkt. No. 14-2 at 148-149.)

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." Id.

In the case at bar, trial counsel was not deficient.  At the PCR hearing, Petitioner alleged his trial counsel was ineffective for failing to present an alibi defense based on the time line.  "To establish an alibi, the accused must show that he was at another specified place at the time the crime was committed, thus making it impossible for him to have been at the scene of the crime." *State v. Diamond*, 280 S.C. 296, 297, 312 S.E.2d 550, 550 (1984) (quoting *State v. Robbins*, 275 S.C. 373, 271 S.E.2d 319 (1980)).  The evidence in the record shows that trial counsel did investigate the timeline of events and was not deficient in failing to assert an alibi defense.

Petitioner's trial counsel testified that he did not personally drive from the Petitioner's workplace to the victim's home. (Dkt. No. 14-4 at 119.)  However, trial counsel did "review various estimations of time provided by…Google maps [or a similar application on the computer].[10]" (*Id.*)  Many of the questions posed to trial counsel at the PCR hearing about his investigation of the timeline could not be recalled by trial counsel.

---

[10] Trial counsel's reliance on Google Maps to determine the distance and travel time from Petitioner's work to the victim's house is not by itself ineffective assistance.  "Courts commonly use internet mapping tools to take judicial notice of distance and geography." *United States v. Sessa*, No. 92-CR-351 ARR, 2011 WL 256330, at *25 (E.D.N.Y. Jan. 25, 2011) *aff'd,* 711 F.3d 316 (2d Cir. 2013) (internal quotations omitted).  Utilizing Google Maps to determine distances and travel times has been used by courts throughout the country.  *See, e.g., Hooper v. Clark*, C/A No. S-08-1773-TJB, 2011 WL 445510, at *8 (E.D. Cal. Feb. 8, 2011);  *Johnson v. Zepp,* C/A No. 10–6810 CJC (AJW), 2010 WL 5116697, at *3 n. 2 (C.D.Cal. Oct.29, 2010) (using Google Maps to note Wasco State Prison is approximately 170 miles from federal courthouse located at 411 West Fourth Street, Santa Ana, California); *Warwick v. Univ. of the Pac.,* C/A No. 08–03904 CW, 2010 WL 2680817, at *3 n. 8 (N.D.Cal. July 6, 2010) (taking judicial notice Ukiah is approximately 100 miles from San Quentin, drive of approximately two hours, using Google Maps).

Petitioner now argues that trial counsel testified at the PCR hearing that an alibi defense "would have been viable, but that he did not significantly explore such a defense at trial." (Dkt. No. 20 at 12.) In the testimony relied on by Petitioner, trial counsel testified that "[t]he distance, obstacles included, took a certain amount for time for him to reach point A to point B and the State's theory is that he did it in time less than that allows, that *would have been* important." (*Id.* at 13 (citing Dkt. No. 14-4 at 118.) (emphasis added). Trial counsel is not stating that an alibi defense was viable in this case. He is stating that if there was not time for Petitioner to reach the house in time to commit the crime, then there would be a viable alibi offense. Furthermore, the entire passage of testimony from the PCR hearing that Petitioner now cites is premised on his leaving work at 11:47. (*Id.*) As discussed in footnote 6, there was ample evidence at trial Petitioner left before 11:47.

Petitioner's PCR counsel called Lee Connelly, a private investigator, to testify. Ms. Connelly testified that she traveled from Petitioner's workplace to the victim's home at the time the Petitioner clocked out, and was able to make the trip in approximately twenty to twenty-one minutes. (Dkt. No. 14-4 at 150-152.) She further testified that there was "was some sort of construction on I-85 south" beginning at 11:30 on the night Petitioner drove to the victim's house. (*Id.*) Assuming Petitioner left at 11:47 despite the evidence that he left earlier, Petitioner would have arrived at the victim's house at approximately 12:07. That would have given Petitioner time to attack the victim before the 9-1-1 call. The court finds Ms. Connelly's testimony supports the State's theory of the case. As such, presenting such testimony at trial would not have supported an alibi defense. The mere fact that construction was going on does not necessarily mean it would take longer to travel. Petitioner's argument also assumes he followed speed limits on the highway and did not make it faster than Ms. Connelly. *See Abara v.*

*Palmer*, No. 3:10-CV-00623-RCJ, 2013 WL 1182108, at *10 n.33 (D. Nev. Mar. 19, 2013) (In analyzing a habeas petitioner's ineffective assistance claim regarding failure to present an alibi, the court noted that the travel time on Google Maps assumes an individual did not exceed the speed limit and that travelers "in the wee hours of the morning" would encounter minimal traffic.)

Having found that trial counsel adequately investigated the timeline of events leading to the assault and battery and that Petitioner did not have a viable alibi defense, this court finds that trial counsel's performance was not deficient. As to Ground Two, Petitioner has not met his burden under §2254(d), and this court recommends that the Respondent is entitled to judgment as a matter of law.

## RECOMMENDATION

Accordingly, the undersigned magistrate judge **RECOMMENDS** that the Respondent's Motion for Summary Judgment (Dkt. No. 15) be **GRANTED.**

**IT IS SO RECOMMENDED.**

January 22, 2016

Charleston, South Carolina

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).